# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs June 30, 2014

## IN RE K.N.B., ET AL.

### Appeal from the Juvenile Court for Sullivan County
### No. J38,484      Mark Toohey, Judge

### No. E2014-00191-COA-R3-PT-FILED-SEPTEMBER 30, 2014

R.H.R. ("Father") appeals the trial court's judgment terminating his parental rights to his daughter, K.N.B., and to another child, S.M.J. (collectively "the Children"). Father is the putative biological father of S.M.J. The Department of Children's Services ("DCS") removed the Children and two half-siblings from their mother's home and placed them in protective custody after police discovered them living in deplorable conditions. They were placed in foster care and subsequently adjudicated dependent and neglected. A year and a half later, DCS filed a petition to terminate parental rights.[1] After a bench trial, the court terminated Father's parental rights to K.N.B. based on the court's finding that abandonment grounds were proven by clear and convincing evidence. As to S.M.J., the court terminated Father's rights based upon his failure to establish paternity. The trial court further found, also by clear and convincing evidence, that termination is in the best interest of the Children. Father appeals.[2] He argues, with respect to S.M.J., that the evidence is insufficient. With respect to K.N.B., he asserts that he was incarcerated during a portion of the four-month period immediately preceding the filing of the petition to terminate and, consequently, DCS and the trial court erred in relying upon that four-month period in assessing the grounds of willful failure to visit and willful failure to support. He does not contest the trial court's best-interest determination. We affirm as to the child S.M.J. and reverse as to K.N.B.

---

[1]In addition to K.N.B. and S.M.J., Mother has two other children, D.L.J.,Jr. and A.J.J. All four children were the subject of the termination petition in the trial court, but only K.N.B. and S.M.J. are the subject of this appeal. Father's paternity of K.N.B. was established in an earlier action. D.L.J., Sr., the biological father of D.L.J., Jr. and A.J.J., is also named as the father of S.M.J. on her birth certificate. DCS alleges, however, that Father is the biological father of S.M.J. As a result, the petition in this case sought to terminate both Father's and D.L.J. Sr.'s rights as to her.

[2]At trial, the Children's mother, H.M.B. ("Mother"), voluntarily surrendered her parental rights. Neither Mother nor D.L.J, Sr., is a party to this appeal and we refer to them only as necessary to present the facts relevant to Father's appeal.

**Tenn. R. App. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed in Part and Reversed in Part; Case Remanded**

CHARLES D. SUSANO, JR., C.J., delivered the opinion of the Court, in which D. MICHAEL SWINEY and JOHN W. MCCLARTY, JJ., joined.

Kenneth E. Hill, Kingsport, Tennessee, for the appellant, R.H.R.

Robert E. Cooper, Jr., Attorney General and Reporter, and Leslie Curry, Office of the Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

Polly A. Peterson, Johnson City, Tennessee, Guardian ad litem.

**OPINION**

I.

This appeal focuses on Father's parental rights to the oldest, *i.e.*, K.N.B., born in 2005, and youngest, *i.e.*, S.M.J., born in 2010, of Mother's four children. In a 2006 child support action, Father's paternity of K.N.B. was established, and he was ordered to pay child support of $306 a month. There is a question regarding the paternity of S.M.J. Despite signing her birth certificate, D.L.J., Sr., denied to DCS that he was the father of S.M.J. He never produced any evidence to corroborate his claim. Mother informed DCS that she told Father "from the beginning" that S.M.J. was his child.

DCS first became involved with the family in March 2010 after being advised that the infant, S.M.J., was born exposed to drugs and that K.N.B.'s education was being neglected. A non-custodial parenting plan was implemented that permitted the Children to remain at home while Mother sought alcohol and drug abuse treatment. On January 30, 2011, the police summoned DCS to the home. DCS arrived to find three of the children living with Mother in "deplorable conditions." S.M.J. was found in her crib drinking spoiled milk. Her hands and feet had turned purple. Two other children were confined to a bedroom where feces were smeared on the floor and walls. They allegedly had not eaten in days. When DCS arrived on the scene, K.N.B. was at the home of a family friend. Mother was arrested and charged with felony child neglect. All four children were taken into protective custody and placed in foster care. At the time of their removal, Father's whereabouts was unknown. Mother advised DCS that he had not been around and did not visit or provide support for K.N.B. In October 2011, the Children were adjudicated dependent and neglected.

Evidence of Father's criminal history indicates that he was most likely in jail when the Children entered state custody. Weeks earlier, on January 11, 2011, Father was convicted of two drug-related offenses and sentenced to 11 months, 29 days in jail, with all but 45 days suspended. DCS filed its petition to terminate Father's rights to the Children on June 7, 2012. In the months prior to the filing, Father made several more court appearances. On February 29, 2012, he was arrested on "several" outstanding warrants in Sullivan County and as a fugitive from justice based on papers out of Scott County, Virginia. On March 3, 2012, Father waived extradition, but the record does not reflect when he was taken to Virginia or whether he was incarcerated there. However, on March 8, 2012, Father was still in Sullivan County. He appeared in general sessions court on two counts of assault and a charge of vandalism stemming from a May 2011 altercation with his parents at their home. Father's parents informed police at that time that Father had "a very bad drug addiction." Father pleaded no contest to the charges and was sentenced to 11 months, 29 days, with all but 15 days suspended. In addition, he was restrained from having "violent contact" with his parents.

Trial on the petition to terminate was held over four days beginning in May 2013 and concluding in December 2013. Travis Sherfey was the Children's DCS case manager since 2010 and continued to handle their case after they came into state custody. At the initial DCS child and family team meeting on February 2, 2011, Mr. Sherfey received information that Father might be living with a girlfriend or with his Mother, but a specific street address was not given. Because Father could not be located, DCS was unable to investigate Father and his circumstances to determine whether he was a possible placement option for the Children.

In the days that followed, Father called Mr. Sherfey. Mr. Sherfey told Father "what was going on, that the [C]hildren were in State's custody and that he need[ed] to participate" in a child and family meeting scheduled for February 18, 2011. Mr. Sherfey informed Father that the purpose of the meeting was to "write the plan for how the [C]hildren were going to leave State's custody and what each . . . party's responsibilities are for that," including visitation and child support. Before the meeting, Mr. Sherfey had pre-conference meetings with all three involved individuals – Mother, Father, and D.L.J., Sr., to be sure they could work together. Father appeared at DCS for the February 18 meeting.[3] During the meeting, Father became upset and walked out. Before he left, however, he was "very clear" that he wanted to pursue custody of K.N.B. As he was leaving, Father told Mr. Sherfey that he would call him within the next three days to work out his part of the permanency plan. Mr. Sherfey followed Father outside to talk with him further. He made sure that Father had his phone number. Mr. Sherfey told Father to contact him and he would schedule another child

_____

[3]Presumably, Father was released from jail early – before the 45 days he was ordered to serve in January had expired.

family team meeting so he could write Father's responsibilities into the plan. Thereafter, Father never contacted Mr. Sherfey, and Mr. Sherfey was never able to reach Father again.

Records obtained from the Child Support Enforcement Division reflect that Father's paternity of K.N.B. was established in a June 2006 child support case and Father was ordered to begin paying child support of $306 per month. The following month, Father made his first and only child support payment. From the time of the Children's removal until the filing of the termination petition, Father had no contact with the child. To Mr. Sherfey's knowledge, Father never provide anything, money or non-monetary items, toward K.N.B.'s support at any time since the child entered foster care. Mr. Sherfey questioned Father about his income and employment, and Father indicated that he had been looking, but was unable to find a job. Father provided nothing to show that he was disabled or otherwise unable to work, nor did he provide any proof to corroborate his claim that he was actively seeking employment.

DCS case manager Stacy Humphrey took over the Children's case in July 2012, after the termination petition was filed. In October 2012, Father's counsel contacted her to request that she arrange visits for Father with K.N.B. On November 30, 2012, Father met with Ms. Humphrey about visitation and other matters; Mother participated via telephone from jail. At the meeting, Ms. Humphrey scheduled weekly visits for Father with K.N.B. Father had his first visit with K.N.B. on December 6, 2012, and his next, and last, on January 24, 2013. After that, Father did not contact Ms. Humphrey again. Although she was unable to reach Father directly from that point on, she was able, a few times, to leave messages for him with his "paramour." Ms. Humphrey repeatedly left messages asking Father to contact her to discuss rescheduling or resuming his visits with K.N.B., but Father never responded.

As the November 30 meeting continued, the issue of S.M.J.'s paternity was discussed. According to Ms. Humphrey, Mother indicated that she had told Father from the beginning that S.M.J. was his child. Father had not filed a petition to establish paternity of the child and did not ask any questions or seek Ms. Humphrey's help in doing so. During the meeting, Ms. Humphrey brought up Father's lack of involvement in the Children's case to that point. Father explained that he had not maintained contact with DCS earlier because he had been "on the run" from the law. Ms. Humphrey reviewed with Father the criteria for termination based on abandonment. He had no questions and appeared to understand what was explained. Ms. Humphrey administered a drug screen at the meeting. Father tested positive for use of oxycodone.

At the time of trial, the Children, and their half-siblings, had been in foster care for two and a half years. They remained together in a foster home in Rogersville. When K.N.B. entered foster care she was "unprepared" for school and had to repeat kindergarten, but since then did "very well" in school. Although all four children continued to have behavior issues

when they first came to foster care, but their case manager testified that they were improving. She observed that their foster mother was better able to parent and command the children's attention. In August 2012, K.N.B. began attending therapy sessions at Frontier Health. Her therapist testified that they mostly dealt with K.N.B.'s behavior at school and her habit of taking things that didn't belong to her. K.N.B. was diagnosed with attention deficit disorder, oppositional and defiant behavior and post traumatic stress disorder. She was prescribed medication and was receiving intensive in-home therapy both in her foster home and at school.

On February 1, 2013, Father participated in a DCS meeting to establish a new permanency plan. For the first time, Father and his specific responsibilities were included in the plan. Ms. Humphrey provided a copy of the revised plan to Father. By the time trial began some five months later, Father had not completed any of his required actions.

At the conclusion of the termination trial, Father moved to dismiss the case as to him in view of DCS's admitted failure to provide him with notice of the definition and consequences of abandonment prior to the filing of the petition for termination. After trial, the court withheld ruling to allow for further legal research on the law concerning the giving of notice to a parent as a pre-requisite to the filing of a petition to terminate.

On January 24, 2014, the trial court entered its order terminating Father's rights. The court found that DCS demonstrated that it made reasonable efforts to notify Father of the criteria and consequences of abandonment, but that Father had thwarted these efforts. On considering the substantive grounds for termination, the trial court found, as to K.N.B., that the grounds of abandonment by willful failure to visit and by willful failure to provide child support were proven by clear and convincing evidence. As to S.M.J., the trial court found clear and convincing evidence proving that Father failed to establish his paternity of the child. Lastly, the trial court found that termination is in the best interest of both children. This finding was said to be made by clear and convincing evidence. Father timely filed a notice of appeal.

II.

Father presents issues for our review that we have restated as follows:

1. The trial court erred in terminating Father's rights on grounds of abandonment because DCS failed to provide Father with the notice of the definition and potential consequences of abandonment as mandated by statute.

2. The trial court applied an erroneous standard of proof in determining whether DCS satisfied the statutory notice requirements concerning the ground of abandonment.

3. The petition to terminate relied upon the wrong four-month period in assessing whether Father willfully failed to visit and failed to support the Children.

III.

With respect to parental termination cases, this Court has observed:

> It is well established that parents have a fundamental right to the care, custody, and control of their children. While parental rights are superior to the claims of other persons and the government, they are not absolute, and they may be terminated upon appropriate statutory grounds. A parent's rights may be terminated only upon "(1) [a] finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and (2) [t]hat termination of the parent's or guardian's rights is in the best interest[] of the child." Both of these elements must be established by clear and convincing evidence. Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable, and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence.

*In re Angelica S*., E2011-00517-COA-R3-PT, 2011 WL 4553233 at *11-12 (Tenn. Ct. App. E.S., filed Oct. 4, 2011) (citations omitted).

"As to the trial court's findings of fact, our review is de novo with a presumption of correctness unless the evidence preponderates otherwise." *In re M.J.B.*, 140 S.W.3d 643, 654 (Tenn. Ct. App. 2004); Tenn. R. App. P. 13(d). Our role is to determine "whether the facts, as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements necessary to terminate parental rights." *Id.* at 654. Great weight is accorded the trial court's determinations of witness credibility, which court findings will not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002). Questions of law are reviewed de novo

with no presumption of correctness. *Langschmidt v. Langschmidt*, 81 S.W.3d 741 (Tenn. 2002).

IV.

A.

In his first two issues, Father contends that the trial court erroneously terminated his parental rights despite undisputed proof that he was not provided with statutory notice of the definition and potential consequences of "abandonment" as a ground for termination. Father's argument is essentially two-fold. He asserts that the trial court (1) impermissibly accepted trial testimony in lieu of an affidavit from DCS detailing its efforts to provide Father with the required notice; and (2) applied the wrong standard of proof in evaluating DCS's efforts to provide the required notice. In this section, we address these related issues in turn.

Father's argument implicates provisions of Tenn. Code Ann. § 37-2-403 (2014). The statute provides, in relevant part, as follows:

> (2)(A) The permanency plan for any child in foster care shall include a statement of responsibilities between the parents, the agency and the caseworker of such agency. Such statements shall include the responsibilities of each party in specific terms and shall be reasonably related to the achievement of the goal specified in subdivision (a)(1). The statement shall include the definitions of "abandonment" . . . contained in § 36-1-102 and the criteria and procedures for termination of parental rights.
>
> (B)(i) The parents or legal guardians of the child shall receive notice to appear at the court review of the permanency plan and the court shall explain on the record the law relating to abandonment contained in § 36-1-102, and shall explain that the consequences of failure to visit or support the child will be termination of the parents' or guardians' rights to the child. . . . If the parents or legal guardians are not at the hearing to review the permanency plan, the court shall explain to the parents or guardians at any subsequent hearing regarding the child held thereafter, that the consequences of failure to visit or support the child will be termination of the parents' or guardians' rights to the child . . . .

(ii) If the parents or guardians of the child cannot be given notice to appear at the court review of the permanency plan, or if they refuse or fail to appear at the court review of the permanency plan, or cannot be found to provide notice for the court review of the permanency plan, any agency that holds custody of the child in foster care or in any other type of care and that seeks to terminate parental or guardian rights based upon abandonment of that child . . . shall not be precluded from proceeding with the termination based upon the grounds of abandonment, if the agency demonstrates at the time of the termination proceeding:

(a) That the court record shows, or the petitioning party presents to the court a copy of the permanency plan that shows that the defendant parents or legal guardians, subsequent to the court review in subdivision (a)(2)(B)(i), has signed the portion of the permanency plan that describes the criteria for establishing abandonment under § 36-1-102, or that the court record shows that, at a subsequent hearing regarding the child, the court made the statements to the parents or legal guardians required by subdivision (a)(2)(B)(i);

(b) By an affidavit, that the child's permanency plan containing language that describes the criteria for establishing abandonment under § 36-1-102 was presented by the agency party to the parents or guardians at any time prior to filing the termination petition, or that there was an attempt at any time to present the plan that describes the criteria for establishing abandonment under § 36-1-102 to the parents or guardians at any time by the agency party, and that such attempt was refused by the parents or guardians; and

(c) That, if the court record does not contain a signed copy of the permanency plan, or *if the petitioning agency cannot present evidence of a permanency plan showing evidence of such notice having been given or an affidavit showing that the plan was given or that the plan was attempted to be given to the parents or guardians by the agency and was refused by the parents or guardians, and, in this circumstance, if there is no other court record of the explanation by the court of the consequences of*

*abandonment and the right to seek an attorney at any time, then the petitioning agency shall file with the court an affidavit in the termination proceeding that describes in detail the party's diligent efforts to bring such notice required by subdivision (a)(2)(B)(i) to such parent or guardian at any time prior to filing the agency's filing of the termination petition.*

Tenn. Code Ann. § 37-2-403(2)(A), (B)(i), (ii)(a)-(c) (emphasis added).

As we earlier noted, the trial court reserved ruling in the instant case in order to allow for further research and consideration of the law regarding the "notice" issue as applicable in the present case. Ultimately, the court allowed DCS to pursue termination based on abandonment. The court concluded that DCS made reasonable efforts to provide the statutorily required notice of the meaning and potential consequences of abandonment to Father, but that Father had thwarted such efforts. In support of its ruling, the trial court set out extensive findings and a detailed analysis in its final termination order.

B.

We begin with that portion of the order dealing with the trial court's decision to accept trial testimony in lieu of an affidavit of "diligent efforts" by DCS as contemplated in Section 37-2-403(2)(B)(ii)(c). The trial court stated:

> [Father] knew that [K.N.B.] was in DCS custody because he contacted DCS and asked how to gain custody of his daughter; he was present at a child and family team meeting on February 18th 2011 for the purpose of creating a permanency plan for the child; however, [Father] became upset and left the meeting before he could be provided a copy of the permanency plan which detailed the procedure and criteria for termination . . . based on the ground of abandonment.
>
> * * *
>
> [G]enerally speaking, [DCS] has to provide notice of those definitions to Respondent Parents, and if they cannot or have not done so, then DCS must explain why it was reasonable for them not to do so, and outline what attempts they made to comply with the notice requirements.

\*     \*     \*

> In [Father's] case[,] it is quite clear that DCS never, prior to the filing of the Termination of Parental Rights Petition, advised him of the consequences of [abandonment] either verbally or through the presentation of a permanency plan; further. . . the Court never, prior to the filing of the Termination . . . Petition, advised him of the consequences. . . . Whether or not the Department can proceed depends on . . . an affidavit of diligent efforts to provide [Father] with notice.

> [DCS] has not filed any such affidavit . . . in this case noting their efforts to provide [Father] with the statutory notice of the abandonment consequences.

\*     \*     \*

> This Court is not aware of any case law that indicates that if an affidavit is not filed[,] the Court cannot accept sworn testimony during the hearing on the issue of notice of abandonment, provided that all parties have had an opportunity to prepare for trial on the issue.

> It is therefore the opinion of this Court that sworn testimony does suffice in the absence of an affidavit so long as there is the opportunity for preparation and cross-examination by Respondent's counsel.

In support of its decision to accept Mr. Sherfey's trial testimony in lieu of an affdavit from DCS detailing its efforts to provide the criteria and consequences of abandonment to Father, the trial court relied, in part, on this Court's opinion in *In re D.D.K.*, No. M2003-01016-COA-R3-PT, 2003 WL 23093929 (Tenn. Ct. App. M.S., filed Dec. 30, 2007). We, too, find that case instructive.

In *D.D.K.*, DCS alleged abandonment by failure to visit or support in the four months prior to the filing of the petition as the sole ground for terminating the father's rights. The trial court granted the petition, and the father appealed. On appeal, the Court began by considering the question of compliance with the statutory provisions under Section 37-2-403, an issue neither party had raised. We acknowledged that when proceeding on the ground of abandonment, "DCS is required by statute to provide notice to the parent of the conduct that

-10-

will constitute abandonment, as a prerequisite to termination on that ground." *Id*., 2003 WL 23093929 at *4. On appeal, the record showed no evidence *by any means* that the father was provided with notice of the meaning and potential consequences of abandonment before the termination petition was filed. He was not involved in pre-petition permanency planning or judicial review of the children's cases after they entered foster care, and DCS had not attempted to provide a permanency plan to him. *Id*. The only evidence with respect to the father was the caseworker's testimony that she sent two letters or notices to the father before filing for termination. The notices were not included in the record and the caseworker's testimony did not indicate that either contained the notice regarding abandonment required by Section 37-2-403. The termination petition was accompanied by DCS's affidavit of its unsuccessful efforts to find the mother, but no such affidavit as to the father. This Court stated: "The record contains no affidavit as required by Tenn. Code Ann. § 37-2-403(a)(2)(B)(ii)(c). In addition, the testimony at the hearing on the petition by the caseworker . . . indicates no affidavit complying with subsection (c) could have been filed." *Id*. at *6. On these facts, this Court held as follows:

> Because the record before us does not demonstrate that Father was provided with the required notice of the definition of abandonment and the consequences of abandonment, and does not include proof of any circumstance justifying the failure to provide notice as set out in the statute, we must vacate the judgment of the trial court terminat[ing] Father's parental rights.

*Id*. at *8.

Returning to the present case, our consideration of the "notice issue" leads us to conclude that the trial court did not commit reversible error in accepting trial testimony by the DCS case manager relating his diligent efforts to provide the required notice to Father in lieu of an affidavit to the same effect. We see no real difference between these two forms of sworn testimony, both of which made the relevant facts known to the court under oath. More significantly, we think, the purpose of the notice provisions must be considered. Again, the statute generally requires that parents be provided with two types of notice regarding the definition and potential consequences of "abandonment" as that term is defined for purposes of parental termination actions. More specifically, "[p]arents must be provided notice in the permanency plan itself and in court when the permanency plan is ratified." *In re Adryan L.B.*, No. M2012-00916-COA-R3-PT, 2012 WL 5266385 at *2 (Tenn. Ct. App. M.S., filed Oct. 24, 2012)(citing Tenn. Code Ann. § 37-2-403(a)(2)). "Without proof in the record of compliance with the notice provisions of Tenn. Code Ann. § 37-2-403, the appellate court must set aside a trial court's finding of abandonment." *Id*. (citing *In re D.D.K.*, 2003 WL 23093929, at *7). Here, in stark contrast to the situation presented in

***D.D.K***., the trial court had ample proof that Father purposefully avoided contact with DCS and thus, despite its numerous, diligent attempts to locate Father in order to provide the notice to him, DCS was unable to do so. The same testimony could have been set out in an affidavit provided to the court during the termination hearing. We say this to make the point that, as we see it, the affidavit of diligent efforts contemplated by Section 37-2-403(2)(B)(ii)(c) is for the purpose of showing definitively that proper notice had been given or that vigorous efforts were unsuccessfully made to give notice. In this case, an affidavit would have been designed to allow DCS to tell the court why it was unable to comply with other provisions requiring it to notify a parent of the definition and potential consequences of abandonment. While the statute does require an affidavit and that is the procedure that should be followed, in this case, sworn testimony before the court at the termination accomplished the same purpose. In short, we conclude that the trial court's reliance on the case manager's testimony was a harmless deviation that does not amount to reversible error.

C.

In a related issue, Father asserts that the trial court applied an erroneous standard of proof in deciding whether DCS could proceed toward termination on the ground of abandonment despite its unsuccessful efforts to provide him with required notice of the definition and potential consequences of abandonment. He points to the following portion of the trial court's ruling on the "notice issue":

> [T]he Court finds by preponderance of the evidence that Mr. Sherffey through his sworn testimony demonstrated that he made reasonable efforts to notify [Father] of the criteria and consequences of abandonment; that his efforts were thwarted by [Father] and that he was not required nor reasonably expected to hunt down [Father] while he was on the run from the law. . . .

Focusing on the court's "preponderance of the evidence" language, Father essentially argues that decisions in parental termination cases are subject to a higher, "clear and convincing" standard. More specifically, Father asserts that just as DCS must prove, by clear and convincing evidence, that it has made reasonable efforts to reunify parents with children placed in foster care, so too, the question of "whether or not the Department has complied with the [notice] provisions of Tenn. Code Ann. § 37-2-403 is to be evaluated by the trial court under the clear and convincing standard."

In our view, Father's argument blurs the real issue. As we have already noted, a heightened burden of proof certainly applies in parental termination cases. To reiterate, "[i]n Tennessee, a court may terminate a person's parental rights only if the party seeking

-12-

termination proves *by clear and convincing evidence* (1) the existence of at least one statutory ground for termination and (2) that termination of the parent's rights is in the best interest of the child." (emphasis added). ***In re B.L.C.***, No. M2007-01011-COA-R3-PT, 2007 WL 4322068 at *3 (Tenn. Ct. App. M.S., filed Dec. 6, 2007)(emphasis in original and internal citations omitted). Father argues that this Court has required the same level of proof in determining whether the statutory notice provisions regarding abandonment have been satisfied as a prerequisite to the filing of a petition for termination. He points to ***In re B.L.C.***, as authority for that proposition. In that case we said the following:

> DCS failed to prove by clear and convincing evidence that the statutory notice requirements were met regarding its efforts to notify Mother. The permanency plans and statements explaining the criteria and procedures for termination of parental rights were provided to and signed by Father, but not Mother. There is no indication that the trial court explained to Mother (or that it had opportunity to explain) on the record the law relating to abandonment. Thus, Mother did not have notice of the definition and potential consequences of "abandonment" as defined by statute. DCS did not file an affidavit in the termination proceeding describing in detail its diligent efforts to bring such notice, as described and required by Tenn. Code Ann. § 37-2-403(a)(2)(B)(ii)(c).

***Id.***, 2007 WL 4322068 at *5. Based on the foregoing deficiencies, we reversed the termination order. Relying on ***B.L.C.***, Father concludes the same result should follow in this case. We disagree.

It is undisputed in the present case that DCS did not provide notice of the definition and potential consequences of abandonment to Father in a permanency plan statement of responsibilities, or otherwise, and the trial court had no opportunity to apprise him of the relevant law. Stated differently, there is no issue as to whether Father had notice of the definition and consequences of abandonment for purposes of parental termination – he clearly did not. The question becomes whether the trial court correctly determined that DCS could proceed on the ground of abandonment despite its admitted failure to provide the required notice of this ground to Father.

At trial, Mr. Sherfey testified regarding his efforts to make contact with Father after Father abruptly left the February 18 meeting. First, he called the number he had for Father, but it was no longer in service. He then sent several notices to Father at his last known address and they were returned. Next, on two occasions, Mr. Sherfey went to the home and

knocked on the door, but no one answered. According to Mr. Sherfey, CASA was appointed at the beginning of the custody case and they too were unable to locate Father. Mr. Sherfey acknowledged that, as a result of his inability to find Father, he never explained or provided the criteria for termination of parental rights or the definition of "abandonment" to Father. He never sent a copy of the permanency plan to Father because earlier notices had been returned as "undeliverable" and he did not want confidential information sent out after that. In March 2011, after he learned that Father might be in the Blountville jail, he sent a notice to him that did not include the termination criteria. Around April 5, 2011, Mr. Sherfey made a follow-up call to the jail, but was advised that Father had been released. Regarding Mr. Sherfey's efforts to find Father and involve him in the case, the trial court said, "I credit his testimony. I believe him." This Court accords "great weight to a trial court's decisions regarding the credibility of the witnesses who have testified before it." *In re Audrey S.*, 182 S.W.3d at 867. In short, the proof shows that after Father left the DCS meeting in February 2011, he was deliberately out of contact with DCS and uninvolved in the case until he resurfaced well after the termination petition was filed.

On our review, we agree with the trial court's conclusion that, under the record before us, DCS could pursue termination on the ground of abandonment despite its inability to comply with the statutory notice provisions. While the trial court alluded to the "preponderance of the evidence" standard, we find and hold that there is clear and convincing evidence to show that case manager Sherfey went to great lengths to locate Father to provide the required notice, but was unable to find him because of Father's lack of cooperation and his admitted unwillingness to be found. In summary, we conclude that the trial court did not err with respect to its determination of the evidence relevant to the "notice of abandonment issue" or its evaluation of such evidence leading to the conclusion that the termination case could proceed. We reject Father's arguments to the contrary.

V.

A.

The trial court terminated Father's rights to K.N.B. on the ground of abandonment pursuant to Tenn. Code Ann. § 36-1-113 (2014). The statute provides, in relevant part, that grounds for termination exist whenever any of the specified forms of "[a]bandonment by the parent or guardian, as defined in § 36-1-102, has occurred." Tenn. Code Ann. § 36-1-113(g)(1). In turn, Section 36-1-102 (2014) defines several forms of "abandonment" for the purpose of termination actions. As relevant in the present case, the statute provides as follows:

(1) (A) For purposes of terminating the parental or guardian rights of a parent or parents or a guardian or guardians of a child to that child in order to make that child available for adoption, "abandonment" means that:

(i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the a [sic] parent or parents or a guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the a [sic] parent or parents or a guardian or guardians either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child;

\* \* \*

(iv) A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration. . . .

Tenn. Code Ann. § 36-1-102(1)(A)(i),(iv).

In the case before us, Father essentially argues that his failure to visit in the four months before the termination petition was filed should be excused because he was in jail during part of that time. He further submits that "the Department plead, in its Petition, that [Father] was not incarcerated during this period of time so any reliance by the Department on abandonment by an incarcerated parent would stand inapposite to the notice which [Father] was provided in the Petition of the grounds he would have to defend against." On our review of the entire record, we conclude that Father is correct.

In its petition, DCS alleged, in relevant part, as follows:

GROUND 1
ABANDONMENT - FAILURE TO VISIT

\*   \*   \*

[Father] abandoned [K.N.B.] because he willfully has not visited in the four months right before this petition was filed.

In the past four months, [Father] has not visited.

*[Father] was not in jail* or incapacitated *in any way in the past four months.*

\*   \*   \*

GROUND 2
ABANDONMENT - FAILURE TO SUPPORT

\*   \*   \*

[Father] [has] abandoned [the child] because [he] willfully has not supported [the child] or [has] made only token payments toward the [child's] support in the four months right before this petition was filed.

\*   \*   \*

[Father] [was] not in jail or incapacitated in the four months before this petition was filed, and could have worked and supported the [child].

(Emphasis added.)  No other grounds for termination as to K.N.B. are alleged as to Father.

As can be seen, DCS alleged only abandonment by failure to support or visit the child as defined in Section  36-1-102(1)(A)(i).  The alternate form of abandonment provided in subsection (iv) of the statute – pertaining to a parent who is incarcerated during all or part of the four months preceding the filing of a termination petition – *is not referenced at all in the petition*.  In our view, DCS essentially made "abandonment by an incarcerated parent" inapplicable when it specifically alleged that Father "was not in jail" in the relevant four-

-16-

month period from February 7, 2012 through June 6, 2012, the day before the petition was filed.

As would be expected, DCS's proof at trial was focused on establishing abandonment as alleged in the petition. The testimony of case manager Sherfey established that Father neither paid child support nor had any contact with K.N.B. in the four months leading up to the filing of the petition on June 7, 2012. At the same time, however, the proof shows that Father was incarcerated for some part of that same four-month period. Certified copies of Father's criminal record show that on February 29, 2012, Father was arrested and taken to jail based on "several" outstanding warrants in Sullivan County and as a fugitive from justice warrant out of Scott County, Virginia. On March 13, 2012, Father waived extradition, but the record does not reflect how long he was jailed in Sullivan County before being taken to Virginia or the dates he may have been incarcerated there. However, on March 8, 2012, Father was still in Sullivan County. He appeared in general sessions court and entered a "no contest" plea to two counts of assault and a charge of vandalism stemming from an altercation with his parents a year earlier. On that date, the court sentenced Father to 11 months, 29 days in jail with all but 15 days of the jail sentence suspended. At trial, Father's counsel questioned Mr. Sherfey extensively regarding his efforts to locate Father and include him in the permanency plan for K.N.B. Counsel asked whether Mr. Sherfey would dispute that Father remained in jail "from February 29, 2012 until August the 20th of 2012. . . .?" In response, Mr. Sherfey acknowledged Father's arrest on February 29, but noted that there was no proof of his release date.

Based on the foregoing, we conclude that the record clearly establishes that Father was incarcerated during *some* part of the four months immediately preceding the filing of the petition to terminate on June 7, 2012. At the very least, Father served 15 days in Sullivan County beginning on March 8, 2012, all within the relevant four months. In support of its finding of abandonment, the trial court stated, in relevant part, as follows:

> [DCS] in this case has only filed, the only statutory grounds that they have alleged with respect to terminating [Father's] parental rights to [K.N.B.], is that [Father] abandoned [K.N.B.] by his . . . willful failure to support or visit the child during the four months prior to the filing of the petition to terminate . . . , or if he was in jail for whatever four month period before that he was out of jail.

\* \* \*

-17-

[R]egardless of what time period you use there, whether it's the four months prior to the petition, or if he was in jail some four month period before that when he wasn't incarcerated, given the time period here and the testimony . . . , I find that he was, that he has in fact willfully failed to support this child during those time periods. And I further find that he, for the same reasons[,] that he has willfully failed to visit with this child during those time periods.

With all due respect to the trial court, it is clear to us that abandonment by an incarcerated parent was not properly pleaded as a ground for terminating Father's rights to K.N.B. Despite obtaining evidence that Father served time in jail within the four months before it filed for termination, DCS did not allege as a basis for severing his parental rights that Father failed to support or visit the child in the four months before he was incarcerated. On the contrary, DCS specifically alleged that Father was not incarcerated during the four months before the petition was filed. In this manner, DCS focused its attention and its proof at trial on the "wrong" statutory four-month period as a ground of abandonment.

Neither do we believe that the issue of whether Father abandoned the child in the four months before he went to jail was tried by consent. Instead, it appears that, at trial, evidence of Father's criminal history was introduced primarily on the issue of DCS's efforts to locate Father in order to provide him with a permanency plan and the required notice of the definition and potential consequences of abandonment, all as discussed earlier in this opinion. In its ruling, noting Father's March 8 sentencing, the trial court observed, "[s]o we know where [Father] was then." The court continued, "the reason that I am making reference to these criminal convictions is . . . in trying to find out why [DCS] didn't locate [Father] and why they were unable to locate him. . . ." When evidence is introduced at a trial on a relevant issue, it cannot be relied upon to show consent to try an issue that was not pleaded. *Hiller v. Hailey*, 915 S.W.2d 800, 805 (Tenn. Ct. App. 1995) (citing *Ray v. The Kroger Co*., No. 83-323-II, 1984 Tenn. App. LEXIS 2966 at *19 (Tenn. Ct. App. M.S., filed June 26, 1984) ("Trial of an issue by consent is not shown by presentation of evidence which is relevant to an established issue and also would be relevant to an unexpressed issue.")).

As we see it, the trial court essentially took an "either/or" approach when it terminated Father's rights to the child K.N.B. on the grounds of abandonment by willful failure to support and willful failure to visit during the four months immediately preceding the filing of the petition *or* in the four months prior to his incarceration. On the record before us, this was error. In short, there is evidence that Father was incarcerated during the four months before the petition was filed, and the ground of abandonment by an incarcerated parent was neither properly pleaded nor tried by consent. We therefore reverse the trial court's judgment

terminating Father's parental rights to K.N.B. on the ground of abandonment pursuant to Tenn. Code Ann. 36-1-113(g)(1), as defined in Tenn. Code Ann. § 36-1-102(1)(A)(i).

B.

With respect to the child S.M.J., the trial court terminated Father's rights on the sole ground of his failure to establish paternity. Father challenges the sufficiency of the evidence in support of this ground. The gist of his argument is that there can be no finding that he failed to file a timely petition for paternity because there is no proof of when Mother gave him notice that he was the child's father. As Father puts its, for this ground to stand, "[i]t would have to be shown that [Father] was provided notice by [Mother] that the child is his at least thirty days prior to the filing of the Petition and [the case manager's] testimony fails to touch upon any such dating of notice to [Father]." In short, we disagree with Father's analysis and conclusion.

Tenn. Code Ann. § 36-1-113(g)(9)(A)(vi) provides a ground for termination based on the failure to establish paternity as follows:

> (9) (A) The parental rights of any person who, at the time of the filing of a petition to terminate the parental rights of such person , . . . is not the legal parent or guardian of such child . . . may also be terminated based upon any one (1) or more of the following additional grounds:
>
> *   *   *
>
> (vi) The person has failed to file a petition to establish paternity of the child within thirty (30) days after notice of alleged paternity by the child's mother, or as required in § 36-2-318(j), or after making a claim of paternity pursuant to § 36-1-117(c)(3)[.]

In support of its termination order, the court expressly found that "[DCS] has proven by clear and convincing evidence that [Father] has failed to establish or exercise paternity of the child S.M.J." The trial court further found as follows:

> The Court notes that [Father] offered no evidence on this ground. Stacy Humphrey[,] DCS case manager[,] testified that [Mother] advised [Father] a short time after the child was born that he may be the father of [S.M.J.]. In November 2012 Ms.

-19-

Humphrey notified [Father] in person that it had been alleged that he was the father of [S.M.J.]. [Father] has without good cause or excuse [failed] to manifest an ability or willingness to take custody of the child. [Father] has failed to file a petition for paternity after receiving notice from . . . Mother and by DCS or pursuant to registry requirements. When [Father] first came to DCS he asked about getting custody of [K.M.B.], and did not even mention S.M.J.

The trial court accurately summarized and considered the relevant proof as to this ground. At trial, the proof showed that in November 2012, Father attended a meeting with Ms. Humphrey in which Mother also participated by telephone. On direct examination, Ms. Humphrey testified as follows:

[Counsel]: Did you ever have a conversation with [Father] about possible paternity of [S.M.J.]?

[Ms. Humphrey]: yes. In the . . . meeting on . . . November 30th, we had the discussion.

[Mother] participated over the phone and so we had the discussion about [S.M.J.] . . . being his alleged child.

[Q]: And did . . . [Mother] confirm that?

[A]: Yes. I believe at the meeting that, they had the discussion that she had told [Father] that [S.M.J.] . . . was his child.

[Q]: At that meeting or did she say she had told him prior to . . .

[A]: No, she had told him prior to that. I believe he knew, well I think at that meeting that she had told him from the, at the beginning that he knew.

[Q]: So at least as far as your knowledge is concerned, he was at least aware of it at that meeting in November?

[A]: Oh, yes.

As we read the statute, it expressly applies to a person, such as Father, who (1) is not the legal parent (or guardian) of a child at the time a petition to terminate parental rights to such child is filed, and (2) has failed to file a petition for paternity of such child within thirty days of notice of his alleged paternity by the child's mother. Under the facts before us, whether he had notice of Mother's allegation that he was the child's biological father "at the beginning" of the child's life, or even much later, since the November 2012 meeting, the exact date of the notice to Father is not relevant. By the time of the May 2013 trial, Father had taken no action to establish paternity. As the trial court noted, Father did not offer any evidence to the contrary at trial.

The evidence does not preponderate against the trial court's findings in support of its conclusion that "[DCS] has proven by clear and convincing evidence that [Father] has failed to establish or exercise paternity of the child S.M.J." The trial court's termination of Father's rights to the child S.M.J. pursuant to Tenn. Code Ann. § 36-1-113(g)(9)(A)(vi) is affirmed.

VI.

Having affirmed the trial court's finding of a ground for termination of Father's right to parent S.M.J., we turn to the issue of S.M.J.'s best interest. As we have noted, Father does not appeal the best interest determination. Again, however, before terminating a parent's rights, a court must determine that two things have been clearly and convincingly proven – "not only that statutory grounds exist but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002)(citing Tenn. Code Ann. § 36-1-113(c)). Upon our review of the record, we have concluded that there is clear and convincing evidence supporting the trial court's finding that termination of Father's parental rights with respect to S.M.J. is in the child's best interest. *In re Arteria*, 326 S.W.3d 167, 184 (Tenn. Ct. App. 2010).

VII.

Nothing in this opinion should be construed as affecting, in any way, the existing custodial rights pertaining to K.N.R.

VIII.

The judgment of the trial court terminating Father's parental rights to S.M.J. is affirmed. The judgment of the trial court terminating Father's parental rights as to K.N.B. is reversed. Costs on appeal are taxed to the Tennessee Department of Children Services. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment as to S.M.J. and the collection of costs assessed below.

_____
CHARLES D. SUSANO, JR., CHIEF JUDGE